# UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

| | |
|---|---|
| COSTCOMMAND, LLC,<br>5614 Connecticut Avenue, N.W.  Suite 220<br>Washington, DC 20015-2604 | : <br> : <br> : <br> : |
| Plaintiff, | :    Civil Action No. _____ <br> : |
| v. | :    **JURY TRIAL REQUESTED** <br> : |
| PRS SOFTWARE SOLUTIONS, INC.<br>912 Ruberta Avenue<br>Glendale, CA  91201<br>Agent for Service: Vincent Dundee III | : <br> : <br> : <br> : <br> : |
| FULL THROTTLE FILMS INC., d/b/a<br>VIDEO EQUIPMENT RENTALS<br>912 Ruberta Avenue<br>Glendale, CA  91201<br>Agent for Service: Scott A. Dundee | : <br> : <br> : <br> : <br> : <br> : |
| WH ADMINISTRATORS, INC.<br>3673 Westcenter Drive<br>Houston, TX  77042<br>Agent for Service: Robert Lee Ring, Jr. | : <br> : <br> : <br> : <br> : |
| and | : <br> : |
| BRENDAN M. TURNER<br>1931 Biltmore Street, N.W.<br>Washington, DC 20009-1509 | : <br> : <br> : <br> : |
| Defendants. | : <br> : |

_____ :

## COMPLAINT

Plaintiff, CostCommand, LLC ("CostCommand" or "Plaintiff"), for its Complaint against

Defendants, hereby alleges as follows:

### JURISDICTION AND VENUE

1.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) as

Plaintiff and Defendants are citizens of, and domiciled in, different states and the amount in controversy exceeds $75,000.00, exclusive of interest, costs and attorneys' fees.  Pursuant to D.C. Code § 13-423, this Court may exercise personal jurisdiction over Defendants because they have the requisite minimum contacts with the District of Columbia.

2.      Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b) as Plaintiff is located within the District of Columbia and many of the acts or omissions giving rise to the claims asserted herein arose here.

## PARTIES

3.      Plaintiff is a single-member Connecticut limited liability company, registered with the District of Columbia as a foreign limited liability company.  Throughout most of the time relevant hereto, CostCommand maintained its principal place of business at 1050 Connecticut Avenue, N.W.  Plaintiff's sole member, Ronald J. Vance, Jr. ("Vance"), a citizen of Maryland, is Chief Executive Officer of CostCommand.

4.      Defendant PRS Software Solutions, Inc. ("PRS") is a California corporation, organized on or about April 25, 2012, and maintains its principal place of business in Glendale, California.  Upon information and belief, PRS is a wholly-owned subsidiary of Defendant, Full Throttle Films Inc., a California corporation doing business as Video Equipment Rentals, and is the agent and/or alter ego of Defendant, Full Throttle Films Inc.

5.      Defendant, Full Throttle Films Inc., which does business as Video Equipment Rentals ("VER"), is a California corporation and maintains its principal place of business in Glendale, California.  VER, which boasts of a substantial inventory of "cutting edge" broadcast, audio-visual and computer equipment available for rent (primarily to the television and motion

picture industry), has offices across the country, including in Lanham, Maryland, from which it serves the Washington, DC metropolitan area, as well as in Toronto and other Canadian locations.  As alleged herein, VER is responsible for the acts and omissions of PRS as its parent, principal or, alternatively, alter ego.

6.     Defendant, Brendan M. Turner ("Turner"), is a citizen and resident of the District of Columbia, or alternatively, of Texas.  Turner was affiliated with CostCommand until his resignation on or about June 28, 2013.  Turner is currently President of Defendant, WH Administrators, Inc.

7.     Defendant, WH Administrators, Inc. ("WH Administrators"), is a Texas corporation, organized on or about July 23, 2013, and maintains its principal place of business in Houston, Texas.

## SUBSTANTIVE ALLEGATIONS

### A.     Background

8.     In or about early 2012, Vance, as an experienced veteran of the insurance industry, recognized that, because of the burgeoning number of new entrants into the government contractor area, there was a niche market for the tracking and reporting of government contractors' employees' wages, benefits, ERISA contributions, and vacation pay (collectively, "fringe benefit obligations"), whereby a government contractor could have access to real-time information regarding its fringe benefit obligations using an enhanced technology platform.  The regulations governing such fringe benefit obligations are in many ways unique to government contractors because of the obligations imposed by statutes such as the Davis-Bacon Act and the Service Contract Act.

9.     That year, while operating his own consultancy business, Vance engaged in a series of discussions and negotiations with Defendant Turner regarding the creation of the company that could provide a comprehensive online system for government contractors to record fringe benefit obligations and thereby ensure compliance with applicable Federal regulations. Vance's interest in partnering with Turner was motivated, in part, by Turner's sales experience in government contractor employee benefit plans and his claim that he had been working extensively with a Canadian company to develop a new software system that could track fringe benefit obligations.

10.     During these discussions, Turner represented to Vance that he had at least 15-20 active relationships through his then-consulting business (called Wage & Hour Solutions) that could be converted into revenue-generating clients of a new venture providing such a service within 90 days.

11.     In mid-August, 2012, during a telephone call, Vance and Turner orally agreed that they would be partners in the new company, which would be located in the District of Columbia. They further agreed that Turner would focus on cultivating and converting his current connections into customers of the new venture and in implementing the "cutting edge," online technology that would address the customers' compliance issues. Vance, for his part, would focus on all the other "back office" activities, such as operations, legal, and personnel.

12.     Based on the expectation that Turner would be the source of all of the new company's revenue for the first year, Vance and Turner agreed that Turner would receive 30% of the equity in the new company, plus half of all profits for the first three years. In the short term, however, in order for Turner to meet his own personal financial obligations, Vance agreed that he

would pay Turner $50,000 in installments over the remainder of 2012, as an initial partnership draw.

13.     With the prospect of likely having at least a half-dozen clients in a matter of weeks, Vance quickly began working on developing a website, reaching out to insurance industry contacts and recruiting potential employees.  At the same time, Turner represented to Vance that he was working on reviving and cultivating the client base of Wage & Hour Solutions, his former business, as well as locating new potential clients.

14.     Throughout the Fall of 2012, Vance – who was still based in Connecticut and had not yet moved to the D.C. area – and Turner talked frequently by phone, with Turner consistently informing Vance of solid leads and contracts that were close to being finalized.  Meanwhile, Vance had retained Connecticut accounting and law firms to work on an operating agreement for the new entity.

15.     By early November 2012, the new company's operating agreement was substantially complete and Vance and Turner had reached an agreement regarding its terms. However, so that Vance could realize the tax advantages for the costs that he alone had incurred in connection with creating the new company, Vance and Turner agreed that the new limited liability company would be created before the end of 2012, and that Turner would sign the operating agreement and become a member in early 2013.  Accordingly, in early December, 2012, CostCommand was organized as a single-member LLC.

16.     During this time, although Turner had received $40,000 from Vance, there were still no signed contracts.  At a meeting in Connecticut later in November 2012 to introduce Turner to several new hires, Vance reminded him of the (now expired) 90-day commitment to

-5-

produce revenue-generating clients.  Turner again assured Vance that contracts would be forthcoming soon.

17.     In addition, by December 2012, despite Turner's earlier representations that the software he had been working on was finished and needed only to be deployed, Turner had yet to deliver the software that would provide the technology platform for the services CostCommand was going to provide.  Vance thus concluded that an information technology ("IT") vendor was needed to create the technology platform and supporting software that would set CostCommand apart from its competitors.

### B.     Agreement with PRS Software Solutions

18.     In early January, 2014, Turner introduced Vance to Brian Hammond ("Hammond"), who was described as the primary software developer and a principal of Defendant, PRS Software Solutions Inc. ("PRS").  Vance was told that PRS was the software development subsidiary of Video Equipment Rentals ("VER"), a major high-tech equipment provider to the motion picture industry.  During their first meeting, held at CostCommand's Washington, DC offices, Hammond assured Vance that, based on their discussions that day, as well as several prior discussions with Turner, PRS not only understood precisely the product CostCommand wanted to create, but it also had the capability to construct a comprehensive online software program that could serve CostCommand's expected clients.

19.     During this same meeting, Hammond stated that PRS would quickly build working versions of the software, which then would be modified based on the feedback received from CostCommand.  Because CostCommand expected to have revenue-generating clients soon, PRS's collaborative, "rapid development" approach to software development was very attractive.

20.     Once Hammond, on behalf of PRS, signed the non-disclosure agreement, Vance explained CostCommand's plan to use a novel and innovative method – which Vance had developed through consultations with attorneys knowledgeable in ERISA – for government contractors to pay for CostCommand's services through ERISA qualified contributions already segregated and held in trust.  In other words, in addition to the unique, real-time monitoring of fringe benefit obligations, it was expected that CostCommand's services would be even more attractive because government contractors could receive them for no additional cost.

21.     Thus, PRS's proposition for no upfront fee or payment was equally attractive. Rather, as compensation for the IT development, PRS wanted a percentage of CostCommand's "trust revenue" (*i.e.*, a portion of the total amount deposited by the client in a trust from which its fringe benefit obligations would be paid, and from which CostCommand's commission would be paid).  Further, for no additional cost, PRS would handle all of CostCommand's IT needs – from website hosting and email servers, to obtaining laptops for CostCommand's employees and maintaining the master database of client and prospects' data.

22.     On January 21, 2013, CostCommand and PRS signed a letter of understanding regarding the foregoing arrangement.  A true and correct copy of the January 21, 2013 Letter of Understanding (the "January Letter") is attached hereto as Exhibit A.  The salient provisions of the January Letter include the following:

- •     PRS would construct and thereafter maintain a "specific need software solution" (termed "CCR") for CostCommand for a three-year initial term.

- •     The software and internet-based platform would be not only capable of being shared with CostCommand's clients, but it would also be used in-house for a wide range of functions, from compliance to sales lead generation.

- "PRS will immediately start the process of removing information from selected websites [a.k.a., "scraping"] and populate the database to begin the historical records."

- Consistent with Hammond's proposal, "CostCommand will pay to PRS a sum equal to 1% (one percent) of the gross contributions made to the irrevocable trust(s) for all contracted corporations or enterprises."

23.     PRS's efforts were quickly evident.  By February 12, 2013, some laptops had been shipped by PRS to CostCommand's Washington, DC office and, by early March, CostCommand's email and website had been moved to PRS's servers.  During this period, PRS was provided with unfettered access to CostCommand's sales prospecting initiatives and began to "scrape" data from several key websites to populate CostCommand's sales database.  PRS was also provided access to CostCommand's online proposal application.  All of this information was unknown to PRS prior to its engagement with CostCommand.

24.     While PRS was ramping up its efforts to provide IT and software development services to CostCommand, Turner delayed signing the CostCommand operating agreement.  As previously agreed, in early January, Vance provided Turner with the finalized operating agreement which would have made Turner a member of the limited liability company, and in which he was identified as CostCommand's Executive Vice President in charge of revenue generation and business development.  Turner, however, insisted that he needed more time to review the document.  Later, when Vance again inquired, Turner claimed that the operating agreement looked fine, but still failed to return a signed copy.

25.     By February, 2013, Turner had received $70,000 in advance "draws" from CostCommand (which, given the absence of any revenue, were funded from Vance's own savings).  In addition to the $50,000 agreed upon in the summer, Turner had requested (and

received) two additional "draws" in December, 2012, and February, 2013, in the amount of $10,000 each.

26.     Following the January meeting with PRS, even more hopeful that Turner's sales efforts would soon produce revenue, CostCommand retained several experienced, senior insurance and financial industry executives, including a Chief Financial Officer/Chief Strategy Officer and a Senior VP of Operations and Compliance, along with several other analysts and support staff.  In addition, Vance was in discussions with another individual to become CostCommand's Chief Marketing Officer.

27.     Vance and Turner planned to travel to California in early March, 2013, to meet with several prospects that Turner indicated were closest to committing to CostCommand.  They were all private security guard firms with contracts with both State and Federal government contracts.  Another purpose of the trip was to meet Hammond and the executives of VER, PRS's parent company.  From the initial January meeting, it had been emphasized that PRS was merely the software development arm of VER, so Vance and CostCommand's new CFO were encouraged to meet their counterparts at VER.

28.     In preparation for the up-coming meeting, Vance was told that a "majority of functionality" of CCR, the software system being designed for CostCommand, would be complete by July 2013.  Confirming their telephone conversation, Hammond sent Vance an email several days later breaking down PRS's development of CCR into four detailed stages – pre-approach, approach, sales process and sale support.  Among other things, Hammond said that he would need to begin interacting with CostCommand's sales personnel soon and would need CostCommand's marketing materials within two weeks.

29.     On March 11, 2013, Vance and CostCommand's CFO went to the Glendale, California headquarters complex of VER (which also housed PRS's principal office) and met with Hammond, Josh Ward (another officer of PRS) and VER's chief financial officer, Ron Murphy ("Murphy"), who was standing-in for Vincent Dundee, III, PRS's owner.  The CostCommand personnel toured the facilities and were told that PRS was an outgrowth of the complex inventory software system that VER had developed in-house, used to track and monitor VER's extensive array of equipment that was rented through VER's offices and deployed throughout the country and abroad.  In VER's "IT room," Vance was presented with two laptop computers that had been built specifically for him and Turner.

30.     Through discussions that day, Murphy, VER's CFO, suggested that a more definitive agreement, beyond the January Letter, was needed to document the relationship between PRS and CostCommand.  Accordingly, it was agreed between Vance and Murphy that VER/PRS would prepare an initial draft of a more detailed agreement.

31.     During the tour and thereafter, it was emphasized that VER and its related companies, such as PRS, were all well-capitalized and well-connected.  Indeed, several times during their meeting, and at the dinner that evening with Hammond and Ward, CostCommand's personnel were told that VER and, by extension, PRS, were well-funded.

32.     On March 12 and 13, 2013, Turner and Vance, accompanied by Bruce Monteith ("Monteith"), an old business associate of Turner's, met with representatives of the three private security service companies regarding hiring CostCommand for fringe benefit obligations monitoring and compliance.  From these meetings, Vance learned that only two of the three prospects, American Guard Services, Inc. and North American Security, Inc., were even

interested, and that while contracts with them could be lucrative (worth several hundred thousand dollars annually), they were still months away from entering into agreements with CostCommand.

33.     As a result, Vance concluded that CostCommand needed third party financing to survive in the interim and so began to develop a detailed business plan that could be distributed to attract potential lenders, which culminated in a final product by early April, 2013.

34.     Meanwhile, Turner's primary focus appeared to be the creation of an alliance with Monteith's company, Speyer Meridian, LLC – a company similarly focused on insurance benefit plans for government contractors' employees.  Unbeknownst to Vance, Turner had previously given permission for the use of CostCommand's logo on Speyer Meridian's website, as part of a "joint venture."  CostCommand was described on the website as "the nation's top compliance specialist for Service Control Act compliance and provider of Health and Welfare plan provider [sic]," and was listed along with El Dorado Insurance Agency, Inc., "the nation's largest commercial insurer of labor-driven service contractors."  On the website, both Vance and Turner were identified as "CEO" of CostCommand.  Once Vance discovered that CostCommand was featured on Speyer Meridian's website, he directed Turner to immediately remove it.

35.     In the weeks that followed, Vance had increasing difficulty contacting Turner. The communications and phone calls that been a semi-weekly occurrence in the summer and fall of 2012 had now dwindled significantly; days and weeks went by before Vance got any reply to telephone calls, emails or texts.  During this same period, Vance discovered that the technology Turner claimed to have developed with the Canadian company actually had never been built and that Turner's insurance license had not been valid for at least two years.

C.      **The Expanding Role of VER/PRS**

36.     By late March and early April, 2013, since Vance could no longer afford to provide the required operating capital himself, CostCommand was almost singularly focused on finding alternative funding sources and thus began to have initial discussions with several different commercial and private investors.

37.     However, early on, Hammond had indicated that PRS was interested in CostCommand's approach and that, if ever necessary, PRS had ready access to "seed capital" through its well-funded parent.  Now, through his discussions with Vance, Hammond knew CostCommand was actively seeking funding.  According to Hammond, VER was interested in providing CostCommand with its needed capital.

38.     At Hammond's strong suggestion, Vance contacted Murphy, VER's CFO with whom he had met in Glendale only a few weeks before.  They scheduled a meeting on May 14, 2013 at VER's offices to review CostCommand's business plan and discuss its funding needs. During the same trip, Vance planned to attend a follow-up meeting with American Guard Services to finalize its agreement with CostCommand.  In an email sent shortly before he left, Vance forwarded a copy of CostCommand's recently-completed business plan to Murphy and suggested that, among other possibilities, CostCommand was amenable to an increase in PRS's percentage of trust revenue.

39.     At the meeting with American Guard Services, which was also attended by Hammond and Ward, Vance learned that Murphy could not make the next day's lunch meeting. Rather, Vance was told that Ward was Murphy's proxy and he had full authority to commit to any financing deal.  Thus, Vance, Hammond and Ward met over lunch later that day to review

CostCommand's business plan and capital needs.

40.     Although CostCommand's long-term funding need was greater, the business plan contemplated an investment of $750,000, estimated to be enough to get through to the first quarter of 2014.  During the lunch, both Hammond and Ward said they had reviewed the business plan, and understood both the need and the opportunity.  Ward said he was ready, on behalf of VER, to commit to providing the requested funding to CostCommand – in response to Vance's repeated questions, both Hammond and Ward assured him that Ward had complete authority to agree to the financing.

41.     As explained by Ward and Hammond, it was an easy decision – VER/PRS had spent a considerable amount in developing the software (which was on-track for its debut in a matter of weeks) and wanted to make sure that the technology, as envisioned by CostCommand, could be widely marketed.  Therefore, the $750,000 investment to ensure CostCommand's viability was the best option.  Per their discussions that day, VER/PRS wanted to combine a low-interest loan with an increase in the percentage of trust revenue (*i.e.*, beyond just 1% per client contribution).

42.     With regard to timing, Ward said that while he was leaving the next day for India (to meet with the VER/PRS software developers in connection with CCR, CostCommand's software product), he would be meeting Murphy in Frankfurt shortly thereafter.  Therefore, Vance could rely on the funding commitment, but the final details and terms would have to wait until Ward returned to the United States in early June.  In response to Vance's concern that June was too late, Ward and Hammond both reassured him that the financing would be a priority, and that the deal would be documented and in place by the end of June, at the latest.  Based on this

positive meeting, and especially the verbal commitment of Ward on behalf of VER/PRS,

CostCommand believed it had a financing deal in place with a strategic partner.  Accordingly,

CostCommand soon broke off all other conversations with potential lenders and investors.

43.    Before returning to Washington, DC, Vance picked up CostCommand's contracts

with American Guard Services, as well as with North American Security.  The virtually identical

agreements, titled "Agreement for Benefit Plan Services," were effective as of May 1, 2013, had

initial terms of three years and detailed the four categories of services CostCommand would

provide: Compliance Administration; Eligibility Administration; Enrollment and

Communications; and Plan Management.

44.    These contracts were significant milestones for CostCommand.  Moreover,

commencing in April, CostCommand began having discussions with United Healthcare, a

leading insurance company, to create an exclusive strategic alliance, with United Healthcare

offering insurance to companies using CCR, the CostCommand software under development by

PRS.

45.    On June 6, 2013, upon Ward's return, a meeting was held in Boston between

CostCommand and PRS to discuss both the financing and the status of development of CCR.

Ward and Hammond, together with a third PRS employee, attended on behalf of PRS.  Along

with Vance and the other CostCommand personnel, also in attendance were two individuals who

were in the final stages of considering positions with CostCommand; they were present not only

so they could confirm CostCommand's financial viability, but also to convey to Ward and

Hammond that CostCommand had staffed key positions with experienced, professional

personnel.  Moreover, Vance made sure that PRS understood that these individuals were being

hired in the expectation of CostCommand receiving the requested funding.

46.     During the meeting, Vance and the other CostCommand representatives were told that Murphy and Vincent Dundee III, PRS's president, were in support of the proposed financing arrangement as outlined in May:  initially, $250,000 would be provided by the end of June as a zero-interest loan, and thereafter, $500,000 in additional financing would be provided in $100,000 tranches.  It was also agreed that the revenue share due to PRS would be adjusted upwards from the 1% per client's trust contribution – initially, based upon the amount that CostCommand borrowed, but then adjusted back down as the principal amount was repaid.

47.     At the conclusion of the meeting, Vance, CostCommand's CFO, Ward and Hammond literally shook hands on the deal.  The responsibility for drafting the appropriate agreements would be divided; VER/PRS would prepare what was now envisioned as a software licensing agreement, and CostCommand's Connecticut counsel would draft the loan agreement.

**D.      Negotiation of the Agreements and Continued Development of CCR**

48.     Following the Boston meeting, there were a number of discussions between PRS and CostCommand regarding several aspects of the CCR software licensing agreement, including ownership of the source code, on which CostCommand ultimately relented in the interest of not delaying the funding agreement.  Meanwhile, the two prospective employees accepted the offers from CostCommand and prepared to start work in July.

49.     Hammond sent Vance a draft licensing agreement on June 19, 2013.  In an email to Vance later that day, Hammond indicated that the initial loan of $250,000 was no problem: "[t]he 250K is as agreed also, no interest, 3 year term etc. etc."  In another email minutes later, Hammond told Vance that his "objective is to get the first 250K done immediately, so we can get

the check out."

50.     On June 24, 2013, Vance sent a revised draft licensing agreement to Hammond. In response, Hammond introduced his brother, Bruce Hammond ("B. Hammond"), a Toronto-based former insurance executive, into the negotiations, explaining that he would be assisting PRS as a consultant to evaluate and resolve the few remaining details.  On June 25, 2013, B. Hammond told Vance in an email that, as to the revised draft licensing agreement, he did not "have a great deal of problems with it," and regarding the "[i]nitial tranche of $250k – will start on this next (today) ...."  A few hours later, Vance confirmed that he had received B. Hammond's revisions to the draft licensing agreement and forwarded to him the draft loan documents prepared by CostCommand's counsel, along with a draft commitment letter for the remaining $500,000.

51.     Just days later, on Thursday, June 27, 2013, following promising meetings with two major D.C.-based insurance benefit brokers, Vance asked Hammond to confirm that the software product would be ready by the end of summer, and at least screen shots within the next 30 days.  Hammond replied minutes later that he was "still working on delivery by end of July. We will make the end of summer delivery".

52.     Vance's email also sought Hammond's input on language that could be included in sales and marketing materials, to reassure potential customers that CostCommand had sufficient financial backing; Vance suggested a reference to VER – if not by name, then as "the world's largest distributor of electronics and technology hardware to the entertainment industry." Hammond replied that he thought "Vince [Dundee] and Ron [Murphy] will be amenable to opening the door a little more.  Let me check with them and explain the situation, we can get

some guidance."

53.    Minutes later, in an email addressed solely to Vance, Hammond provided an

update on development of CCR, explaining that:

- In response to input from CostCommand's Operations VP and others, "[a]ll bugs and adjustments have been posted [to the census function] and will be corrected by Monday."

- The "contract control" would be "ready to test by the end of first week of June," and "we will build the 'time and attendance,' which will start second week of July" and which would "interface with census and contract control to track compliance."

- "The compliance dashboard is a mashing together of all of the information gathered, and portraying it in a manner that is easily understood," and that "end of July is feasible, which gives a month for testing and changes."

54.    Vance's need for reassurance was understandable.  Beginning in May, 2013,

CostCommand had been conducting weekly conference calls with Hammond to try and gauge the

status of PRS's software development.  Despite Hammond's continued claims that "everything is

on schedule," there did not appear to be any significant progress.  Notwithstanding claims that

the "compliance technology," *i.e.*, the client interface portion, would be completed by the end of

July, neither Vance nor anyone else at CostCommand had seen any screen-shots, beta sites or

demonstrations to support this claim.  Thus, Hammond's commitment to the completion of the

software by specific dates was significant.

55.    Two days later, upon review of B. Hammond's final revisions, CostCommand,

through Vance, executed the Subscription Licensing Agreement (the "Licensing Agreement")

with PRS.  A true and correct copy of the Licensing Agreement is attached hereto as Exhibit B.

By its terms, the Licensing Agreement set forth, *inter alia*, the services and technical support to

be provided to CostCommand by PRS.  PRS comprehensively defined CCR, the software

product, as "[s]oftware developed by PRS exclusively for [CostCommand] to identify, propose

and sell Government contractors' benefit programs compliance.  It is a selling, compliance and

trust tracking program that uses a collection of proprietary products customized to perform [a

number of specified functions]."

56.     The Licensing Agreement further provided, *inter alia*, that CostCommand's

"license to use the CCR CostCommand Product is exclusive, throughout the United States, to

[CostCommand]."  It called for a "Review Period," during which CostCommand could "verify

that the Software substantially complies with the Acceptance Criteria," which was defined as

"performing in all material respects in compliance with the Service Levels, Specifications,

Documentation and the applicable warranties set forth in [the Licensing Agreement]."  The term

of the Licensing Agreement was five years, two years more than the January Letter, with an

option for an additional five years.  Compensation to PRS was a fee "equal to 1% of the [gross]

monthly Contributions made to the trust(s)."

57.     The financing documentation likewise went through several iterations between

PRS and CostCommand.  Ultimately, in the interest of moving forward, and because the timing

and nature of the subsequent tranches of $100,000 each were still under discussion, the

promissory note drafted by CostCommand's counsel covered only the initial $250,000, zero

interest loan.  Vance signed the Promissory Note the same day as the Licensing Agreement –

June 29, 2013 – and forwarded both documents to Murphy and PRS that same day.

**E.     Turner's Departure**

58.     After receipt of the American Guard Services and North American Security

contracts in May, because the CCR software was still under development, the tracking and monitoring services initially were performed manually by CostCommand.  Ultimately, North American Security held off on making any contributions to the trust established by CostCommand, insisting that it would be premature until the software was operational. Nevertheless, shortly after the contract was entered into, trust revenue began to be generated by American Guard Services.

59.     Accordingly, on June 12, 2013, Vance informed Monteith that, as Speyer Meridian arranged the introduction, he should expect his commission payment from the insurance company once it was paid.  In response, Monteith insisted that his commission come from CostCommand and disputed the amount; although the applicable insurance product only paid a 5% commission, Monteith demanded 30%.

60.     In a separate email later that day, Vance asked Turner where Monteith's inflated commission amount came from, and also requested an update on several sales prospects.  Vance was "very concerned that you don't seem to be putting out any quotes/proposals, so I'm not sure how we are going to sell anything."

61.     It was not until the evening of June 21st that Turner replied, saying only that he had "dealt with Bruce [Monteith]" and giving only cursory updates on several of the prospects mentioned by Vance.  Vance replied later that evening, challenging several of Turner's updates and noting that "[t]he clock is at 10 months and you've sold nothing beyond what Bruce [Monteith] has brought you."  On June 25, 2013, Turner responded, complaining that he never agreed to report to Vance and that he had "zero involvement" in the creation of CCR.

62.     The next (and last) communication Vance received from Turner was on June 28,

2013, the day before the Licensing Agreement and Promissory Note were signed.  In that email, Turner gave his resignation, effective immediately.

63.     While Turner's email gave no hint of his future plans, his corporate credit card and phone records indicated that Turner had traveled to Houston, Texas in early June, 2013, following a particularly lengthy telephone call with a Maryland attorney specializing in employment matters.  Vance also discovered that, although the American Express charge card issued to Turner was intended to be used for sales-related activity on behalf of CostCommand, it had been used for an inordinate amount of clearly personal charges throughout the first half of 2013, in addition to the recent trip to Houston.  For example, Turner had used the CostCommand charge card to pay his home electric bill to Pepco; there were also charges to supermarkets near Turner's home, as well as nearby restaurants and bars.  In total, Turner's personal charges for the first six months of 2013 totaled almost $13,500 (which was in addition to the $70,000 in "draws" that Turner had received through February, 2013).

64.     Following Turner' resignation, CostCommand attempted to communicate with Turner several times to demand the return of the company-issued cell phone, a VOIP handset, a laptop computer, and a printer.  Turner, however, ignored each of these requests and has never returned CostCommand's property.

**F.     <u>VER Reneges On Its Commitment</u>**

65.     Based on the oral agreement reached with Ward and Hammond in Boston in early June, and as evidenced by the Promissory Note and Licensing Agreement executed by CostCommand on June 29, 2013, CostCommand expected that the initial installment of $250,000 would be received in its operating account by Monday, July 1, 2013.  However, no

acknowledgment of the signed Licensing Agreement and Promissory Note was received and the deposit was not made.  Instead, on July 2, 2013, Vance received a telephone call from Murphy, who said VER was not prepared to go forward with the loan.

66.     VER's failure to provide the promised funds was devastating to CostCommand. The lack of funding created challenges for CostCommand to even make payroll, particularly for the recently-hired employees, as well as to meet outstanding accounts payable.  Strategically, the timing could prove crippling.  The majority of insurance benefits renewals occur on January 1st, and CostCommand's goal was to be fully operational well before then – among other things, CostCommand needed satisfied clients to use as endorsements.  More specifically, the discussions with United Healthcare, begun in April, were progressing to the point that CostCommand had already committed funds to support a marketing initiative for the alliance, to be announced just before the Affordable Care Act – which mandates, *inter alia*, that government contractors provide health insurance for their employees or face steep fines – became "live" in January, 2014.

67.     The projections for the United Healthcare alliance had been very encouraging: United Healthcare's own estimates were for 20 customers by the beginning of 2014, with an average number of 350 eligible employees each.  The average monthly revenue per employee was estimated to be $430.00, or more than $3 million per month in the aggregate.  In addition, a number of large insurance brokers in the Metropolitan D.C. area had contacted Vance with interest in CostCommand and had requested meetings.  Because of the "about-face" by VER, all these efforts had to be put off and delayed.

68.     In Vance's discussions with Hammond in early July, Hammond attributed the failure of the loan commitment to Ward's inability to convince Dundee and Murphy, and CostCommand was urged to revise its business plan and make another attempt.  Hammond's brother, B. Hammond, the former insurance executive and now consultant, was suggested as a coach.  Through most of July, working with CostCommand's CFO, B. Hammond undertook an excruciatingly detailed analysis of CostCommand's business plan, its relationships and prospects for development, and its financial information to date.  Although ordinarily it would have been unusual to allow dissemination of such confidential and sensitive information (such as a potential client list derived from United Healthcare), by this point, CostCommand viewed VER/PRS as a "last-ditch" financing source and, as a consequence, relented to the grueling examination.  By the first week of August, 2013, CostCommand was told that the analysis was complete and that B. Hammond would re-submit the financing proposal, with his recommendation for approval, to Murphy.

**G.     Development of CCR Ceases**

69.     During this same time period, even though CostCommand was adhering to the terms of the Licensing Agreement – including the timely submission of the monthly fee derived from its sole client, American Guard Services – since late June, PRS appeared to have abandoned the development of CCR, the software product.  At a July meeting with American Guard Services to discuss implementation of CCR, Vance looked on as neither Hammond nor Ward could even demonstrate the software.

70.     Nevertheless, the weekly Friday conference calls on the status of CCR still occurred, and Hammond continued his claims that development of the software program was

progressing.  For instance, in a July 25, 2013 email, Hammond offered that PRS had finished the "Wage and Hour (Time and Attendance) upload and merge," and although "a few tech issues ... with a module [had] cost us two days ([it was] not really a big deal as I was a little ahead)." Purportedly, PRS was "still on track to have the basic compliance up and running by mid - August, most functionality by end of August, and ready to use."  In a later, separate email to Vance, Hammond repeated that "[w]e are in good shape ...."

71.     However, the lack of progress severely hampered CostCommand's sales ability. During the conference call on August 9, Hammond was told that, in order to make a proposal to a major insurance brokerage during the week of August 19, CostCommand would need either multiple screens within CCR to be ready or, at a minimum, dummy screens that could show what CCR would eventually look like.  Hammond said CCR would be ready.  During the conference call just days before, Hammond reiterated that multiple screens within CCR would be ready "by Monday."  On August 19th, however, only one new screen – the timesheet screen – had been added, and all the other screens that were necessary for CostCommand to make a credible proposal to the insurance broker were marked "under construction."

72.     Later that day – August 19, 2013 – Vance received a letter from Ward, stating that although CostCommand's funding request (as reformulated by B. Hammond) had been reconsidered, there would be no change in position and consequently, the loan request was denied.  Curiously, however, Ward also wrote that "PRS is willing to work with you to start building the trust and compliance software for your enterprise [and] [i]f you are still interested we should work toward finalizing a licensing agreement."

73.     Beyond the disappointment that PRS was reneging on its funding commitment,

Ward's letter raised some fundamental questions – why was PRS only now expressing its willingness to "start building the trust and compliance software"?  Wasn't that what Hammond had been doing since January?  Moreover, there was no licensing agreement to be finalized or discussions that needed to be reopened – the Licensing Agreement had been signed and the monthly fee, derived from American Guard Service's trust contribution, had been submitted to, and accepted by, PRS on a monthly basis.

74.     In an email the next day, Hammond offhandedly moved PRS's deadline for completion of CCR to "the first week of September."  Vance responded, pointing out that the dates kept changing: "At various times, you have said "end of August", "end of summer", and in your note below "by first week of September" - we are not sure if this is the beginning of the first week, or the end of it."  Furthermore, CostCommand needed a firm completion date:

> United Healthcare is committed to bringing between 5,000 and 10,000 employee lives onto this platform for Jan 1, 2014, and expects consistent growth throughout the year – the largest benefit shops in DC have indicated a willingness to move blocks of business to us based on the capability that you're building for us.

Hammond's response seemed to excuse the lack of progress on the fact that PRS would be receiving no revenue until 2014.  He added that the "new" licensing agreement would "reflect[] the change in marketing approach."

75.     PRS's position was unfathomable.  First, in late June, CostCommand was assured that "end of July is feasible, which gives a month for testing and changes."  In July, it was told that "basic compliance [would be] up and running by mid-August, most functionality by end of August, and ready to use."  In early August, PRS claimed that the entire system would be completed by September 1, but by August 19, only "trust compliance" would be done by the first

week of September.  Later that same week, Hammond said that trust compliance would be ready "right after Labor Day."  Second, PRS ignored that it had been receiving revenue, albeit modest, from the American Guard Services fund account since June.  Third, the references to a new licensing agreement and a change in "marketing approach" were bizarre – from CostCommand's perspective, the Licensing Agreement was the operative contract between the parties and there had been no change in CostCommand's "marketing approach."

76.     In an August 27, 2013 email, Hammond next represented, *inter alia*, that CCR would "have enough functionality by October 1st to start the process ..."  CostCommand's response the next day was comprehensive; in part, PRS was reminded that while it had "a significant number of prospects to work on for January 1 through our United Healthcare alliance. Unfortunately, they are all asking for a complete demonstration of our technology, and we have NOTHING TO SHOW THEM."  Similarly, PRS made no mention of "the required client dashboard, which is the foundational element of technology from the clients' perspective. ... our clients simply want to see a screen that shows them all of the areas where they might have an issue ...."  From CostCommand's perspective, "[i]t seems as though we have been strung along for months ...."

77.     PRS missed the September 3rd deadline.  However, the next day, CostCommand received a letter from Ward – backdated to September 1, 2013 and included a new Toronto, Canada address for PRS – stating PRS had "reconsidered our licensing discussions" and that, via the attached Subscription Licensing Agreement (the "Replacement Agreement"), was demanding "two changes from previous drafts."

•     CostCommand was told that the Replacement Agreement removed all mention of

intellectual property because PRS had concluded that the compliance information was publicly available, and that PRS had "hired a third party compliance consultant to provide the necessary compliance intelligence that PRS required to complete programming."

• Based on what PRS described as "a number of significant changes in [CostCommand's] different proposed business plans, and the resulting management team, and a number of promises made to PRS of revenue streams for licensing starting in June of 2013 that were not forthcoming," CostCommand would be offered only a non-exclusive licensing agreement.

PRS concluded with the absurd contention that "[t]he structural and business plan change that [CostCommand] has recently made, as well as the lack of revenues to PRS is a serious breach of our understanding ...."

78.    Ward's September 4th letter represented a sea-change from what the parties had agreed to since January, 2013 and ensured that CostCommand would have to walk away from the United Healthcare opportunity as well as the other prospects.  Within a few weeks, CostCommand responded, asking, *inter alia*, to review the CCR product that Hammond had supposedly completed, and what PRS meant by the business plan and management team "changes," since the former was at Hammond's (and his brother's) suggestion and the latter could only refer to Turner (who was not management).

79.    In an October 8, 2013 email, Hammond response said only that PRS would "take your email under consideration and respond in due course" and challenged the assertion that any portion of the CCR product was "completely unique to CostCommand."  He then offhandedly claimed that "the software that we have talked about with you since day 1 of our discussions is finished and available to you [and] [t]he only piece incomplete was the 'dashboard' that we discussed late in June to be ready in September, which is available to you now."

80.     Surprised by Ward's claim, Vance and his colleagues went onto CostCommand's

website and discovered that, unbeknownst to them, the home page now said "PRS":



81.     Furthermore, once you logged into the website, the name "WH Administrators, Inc." now appeared.  Although some fields appeared to have been added, there was no additional functionality.  The post-log in page appeared as follows:



**H.     The Truth Is Revealed**

82.     Soon after discovery of the WH Administrators logo on its website,
CostCommand learned that WH Administrators had been created in July, 2013 under the laws of
Texas, and that Turner is its president.  Moreover, WH Administrators shares the same Houston
address as El Dorado Insurance Agency, Inc., and El Dorado's president, Robert L. Ring, also
serves as a director of WH Administrators.  Thus, Turner's current connection with El Dorado
explained the early June plane trip to Texas.  Furthermore, Monteith is the other director of WH
Administrators (in or around October, 2012, Elizabeth Souther Insurance Group, of which Bruce
Monteith was president, was acquired by El Dorado – both catered specifically to security
agencies (such as American Guard Services and North American Security) – and after the
acquisition, Monteith was listed on El Dorado's website as an agent).

83.     Upon information and belief, Turner and VER conspired to deny CostCommand
the financing to which VER had already agreed and, following Turner's June 28, 2013 email
resignation, PRS engaged in foot-dragging regarding development of CCR to allow Turner and
Monteith time to get WH Administrators up and running.  Eventually, PRS placed the WH
Administrators logo on CostCommand's website.

84.     The Speyer Meridian website, to which Turner had added CostCommand's logo
back in April (and which was then removed at Vance's direction), now featured WH
Administrators as a "strategic partner."  Reminiscent of CostCommand's earlier description on
the same website, WH Administrators is identified as "the nation's top compliance specialist for
Service Contract Act and provider of Health and Welfare Plans."  More specifically, WH

Administrators claims to have "technology driven compliance software" that would guarantee

"compliance with all relevant federal regulations," as well as "[t]echnology driven onboarding

[using] a single point of capture for all employee data which flows through the only automated

WOTC processing system in existence ...."

85.     In addition, the page of Speyer Meridian's website devoted to services provided

on behalf of federal contractors featured a testimonial by the CEO of Pritchard Industries, lauding

the benefits of the Speyer Meridian program.  Pritchard was one of Turner's prospects that Vance

specifically asked about in his June 19, 2013 email.  Moreover, the website page for services

provided to commercial contractors features a testimonial by the CEO of North American

Security, stating that it "relies on WH Administrators to provide complete compliance with our

Service Contract Act obligations . . . ."  However, North American Security is still under contract

with CostCommand.

86.     On November 18, 2013, CostCommand suddenly learned that its sole remaining

customer, American Guard Services, was switching to WH Administrators.  Although the

contract with American Guard Services provides for, *inter alia*, notice prior to termination, none

was given.

87.     Upon information and belief, Turner conspired with Monteith to leave

CostCommand and create WH Administrators beginning in the Spring of 2013.  Thus, Turner

ceased all sales efforts, instead using CostCommand's charge card to augment his personal

finances, as well as other expenses associated with setting up WH Administrators.  Once Turner

left CostCommand, at the latest, Hammond, Murphy and others at VER reconsidered whether to

back CostCommand.  Then, under the guise of refining CostCommand's business plan and

-30-

creating a more reasonable proposal, B. Hammond was used to obtain CostCommand's marketing strategy, which was likely passed along to WH Administrators.  Meanwhile, CostCommand was strung along throughout the Summer while WH Administrators solidified its competitive position.  With the prospect of being able to deliver a functioning software product (which PRS contracted to deliver to CostCommand, but failed to ever provide), WH Administrators lured away North American Security and American Guard Services despite the presence of valid, signed agreements with CostCommand.

88.     As a direct result of the foregoing acts, CostCommand has been irreparably damaged, and its business has been destroyed.

89.     Based on the facts alleged herein, VER is responsible for the acts of PRS, its ostensible subsidiary:

- PRS, only recently incorporated and presumably under-capitalized, shares the same physical location as VER.

- Employees and services are shared, as shown by the custom-built laptops presented to CostCommand from VER's "IT Room," and the attendance of a VER employee, along with Hammond and Ward, at the June meeting in Boston.

- Both VER and PRS are owned and controlled by the sons of Vincent Dundee, Jr., and Vincent Dundee III, an officer of both VER and PRS, could commit VER to a lending agreement entered into by PRS.

- Murphy, VER's CFO, directed when and how agreements should be entered into by PRS.

- As boasted by Hammond and attempted in CostCommand's situation, VER would make lending decisions based on little more than PRS's recommendation.

- Throughout the relevant period, CostCommand was continually reassured that PRS enjoyed the full financial backing of VER.  Indeed, Hammond's

reaction to Vance's suggestion that VER be referenced as CostCommand's source of funding was only that VER's permission was needed, not that the entities were separate.

There is such a unity of interest and ownership between VER and PRS that the latter is not independent and does not have its own existence.  Having presented the two companies as one, it would be inequitable and unjust to permit VER and PRS to now assert a legal distinction.

90.     The same factual allegations also support the conclusion that VER is responsible for the acts of PRS through principles of agency.  PRS was only recently created as a vehicle for VER to exploit the inventory-control and related technology VER already possessed, in order to expand its reach into software development.  As previously alleged, the two companies are close – controlled by brothers, and sharing, *inter alia*, physical offices, the CFO of VER spoke for PRS, and PRS employees reported to the officers of VER.  Although the loan evidenced by the Promissory Note was with PRS, CostCommand reasonably believed that the funds would originate with VER.  This was evident in, *inter alia*, Vance's May 12, 2013 email to Murphy, VER's CFO, regarding a change in the proposed percentage of PRS's compensation.  Whether as an actual subsidiary, as initially represented to Vance, or otherwise, PRS reported to, and was directed by, VER.  Accordingly, VER is responsible for the wrongful acts of PRS.

**CLAIMS FOR RELIEF**

<u>**COUNT I**</u>
**(Breach of Fiduciary Duty – Against Turner)**

91.     Plaintiff incorporates by reference the foregoing paragraphs 1-90 as if fully set forth herein at length.

92.     From the time of the oral agreement in mid-August, 2012 up to and including the date of his resignation, Turner was a *de facto* partner, member and/or employee of CostCommand, a closely held entity.  As such, Turner owed CostCommand a fiduciary duty of loyalty and to avoid self-dealing.  Even after his resignation, Turner owed CostCommand an ongoing duty not to use CostCommand's confidential and proprietary information for his own personal advantage.

93.     Turner breached his fiduciary duties through his repeated misrepresentations regarding the existence and stages of the software development, the existence of prospects and the stage of ongoing negotiations with them, and through his receipt of payments totaling over $70,000 despite his minimal or nonexistent efforts on behalf of the company.

94.     Turner also breached his duty of fiduciary duty by embezzling approximately $13,5000 in personal charges on CostCommand's charge card.

95.     Upon information and belief, Turner also breached his fiduciary duty by using CostCommand's confidential and proprietary information, including contract terms, pricing, marketing strategies and plans, and other proprietary company information stored on his CostCommand-provided laptop computer, to set up and establish the business of WH Administrators both before and after his resignation from CostCommand.

96.     As a direct and proximate result of Turner's breaches, CostCommand has been damaged in an amount in excess of $75,000 to be proven at trial.

## COUNT II
### (Conversion – Against Turner)

97.     Plaintiff incorporates by reference the foregoing paragraphs 1- 90 as if fully set forth herein at length.

98.     By failing to return CostCommand's cellular telephone, VOIP handset, laptop computer, and printer, as well as the data and information contained thereon, Turner has unlawfully exercised and continues to exercise control over CostCommand's property in denial of CostCommand's rights thereto.

99.     As a direct and proximate result of Turner's breaches, CostCommand has been damaged in an amount to be proven at trial.

## COUNT III
### (Violation of Merchant's Civil Recovery for Criminal Conduct Act,
### D.C. Code §§ 27-101, *et seq.* – Against Turner)

100.    Plaintiff incorporates by reference the foregoing paragraphs 1- 90 as if fully set forth herein at length.

101.    As more fully alleged herein, through his use of CostCommand's charge card to pay for personal charges, Turner embezzled approximately $13,500 from CostCommand, and did so under deceptive circumstances.  Turner also engaged in theft through his continued exercise of control over and disposition of the CostCommand-furnished laptop, cell phone, and other equipment with the intent to deprive CostCommand of its right to the property or its benefit, and to appropriate the property to his own use or the use of WH Administrators.

102.    Turner engaged in a scheme or systematic course of conduct with intent to defraud or obtain the property of CostCommand by means of a false or fraudulent pretense, representation or promise and thereby obtained CostCommand's property and caused CostCommand to lose property.

103.    Turner's acts constitute both fraud and theft within the meaning of D.C. Code §§ 27-101(1) and (5) (incorporating D.C. Code §§ 22-3221 and 3211, respectively).  Moreover, CostCommand is a "merchant" within the meaning of D.C. Code § 27-101(3).

104.    As a direct and proximate result of Turner's violation, CostCommand is entitled to treble the amount of its actual damages, as well as its attorneys' fees and costs.

## COUNT IV
### (Fraud – Against Turner)

105.    Plaintiff incorporates by reference the foregoing paragraphs 1- 90 as if fully set forth herein at length.

106.    Through his statements about his ability to bring in prospective clients (including his statement to Vance that he had at least 15-20 active relationships that could be converted into revenue-generating clients of CostCommand within 90 days), the status of his supposedly advanced negotiations with purported prospective clients, and his statements regarding the supposed existence of a software package that could serve as the platform for CostCommand's business, Turner made representations of material fact, with the knowledge that they were false or in reckless disregard of their truth or falsity.

107.    CostCommand reasonably relied upon Vance's misrepresentations.

108.     Turner intended to deceive Vance, as shown by the fact that, after accepting $70,000 in supposed "draws" and continuing to misuse the CostCommand charge card, Turner abandoned any pretense of attempting to advance CostCommand's business interests and instead pursued the creation of WH Administrators starting in the Spring of 2013.

109.     As a direct and proximate result of Turner's misrepresentations, CostCommand has been damaged in an amount in excess of $75,000 to be proven at trial.

### COUNT V
### (Intentional Interference with Contractual Relations –
### – Against Turner and WH Administrators)

110.     Plaintiff incorporates by reference the foregoing paragraphs 1- 90 as if fully set forth herein at length.

111.     Turner and WH Administrators knew that CostCommand had existing contracts with PRS, American Guard Services, and North American Security.

112.     Turner and WH Administrators took steps intentionally designed to interfere with CostCommand's existing contracts, including, *inter alia*, Turner's improper use of CostCommand's proprietary and confidential business development plans, marketing strategies, and other information.  The intentional interference of Turner and WH Administrators alleged herein goes well beyond ordinary competition and is not privileged.

113.     As alleged herein, the intentional interference of Turner and WH Administrators has caused PRS, American Guard Services, and North American Security to breach their contracts with CostCommand.

114.    As a direct and proximate result of the wrongful conduct of Turner and WH Administrators, CostCommand has been damaged in an amount in excess of $75,000 to be proven at trial.

115.    The acts of Turner and WH Administrators alleged herein were willful, malicious and oppressive, and CostCommand is thereby entitled to punitive damages.

## COUNT VI
### (Intentional Interference with Prospective Economic Advantage – Against Turner and WH Administrators)

116.    Plaintiff incorporates by reference the foregoing paragraphs 1- 90 as if fully set forth herein at length.

117.    Alternatively, Turner and WH Administrators knew that CostCommand had existing business relationships with PRS, American Guard Services, and North American Security, that CostCommand was likely to enter into future business transactions with these third parties, and that these business transactions would result in economic benefits to CostCommand.

118.    Turner and WH Administrators have intentionally taken steps designed to disrupt and interfere with CostCommand's prospective business relationships, including, *inter alia*, Turner's improper use of CostCommand's proprietary and confidential business development plans, marketing strategies, and other information.  The efforts of Turner and WH Administrators go well beyond ordinary competition and are not privileged.

119.    The wrongful conduct of Turner and WH Administrators has resulted in the destruction of CostCommand's prospective business relationships with these third parties.

120.     As a direct and proximate result of the wrongful conduct of Turner and WH Administrators, CostCommand has been damaged in an amount in excess of $75,000 to be proven at trial.

121.     The acts of Turner and WH Administrators complained of herein were willful, malicious and oppressive, and CostCommand is thereby entitled to punitive damages.

## <u>COUNT VII</u>
**(Breach of Contract – Against PRS and VER (Licensing Agreement))**

122.     Plaintiff incorporates by reference the foregoing paragraphs 1- 90 as if fully set forth herein at length.

123.     CostCommand and PRS, and through PRS, VER, were parties to the Licensing Agreement.

124.     CostCommand performed all conditions, covenants and promises required in accordance with the terms and conditions of the Licensing Agreement, including the monthly remission of a portion of American Guard Services' trust revenue to PRS, and through PRS, to VER.

125.     PRS, and through PRS, VER, materially breached its obligations under the Licensing Agreement by, *inter alia*, (1) failing to develop the CCR software to enable CostCommand to identify, propose and sell Government contractors' benefits programs compliance, (2) violating the exclusivity provision of the Licensing Agreement, as evidenced by the logo of WH Administrators on the CostCommand website, and (3) misappropriating CostCommand's proprietary trade secrets relating to, *inter alia*, the funding of a compliance program through trust revenue and otherwise disclosing confidential information.

126.     As a direct and proximate result of the breaches of PRS, and through PRS, VER, CostCommand has been damaged in an amount in excess of $75,000 to be proven at trial.

### COUNT VIII
**(Breach of Contract – Against PRS and VER (Promissory Note))**

127.     Plaintiff incorporates by reference the foregoing paragraphs 1- 90 as if fully set forth herein at length.

128.     CostCommand and PRS, and through PRS, VER, were parties to the Promissory Note and the loan commitment it represented.

129.     CostCommand performed all conditions, covenants and promises required in accordance with the terms and conditions of the Promissory Note.

130.     PRS, and through PRS, VER, materially breached their obligations under the Promissory Note by, *inter alia*, failing to loan CostCommand the promised $250,000.

131.     As a direct and proximate result of the breaches of PRS, and through PRS, VER, CostCommand has been damaged in an amount in excess of $75,000 to be proven at trial.

### COUNT IX
**(Promissory Estoppel – Against PRS and VER)**

132.     Plaintiff incorporates by reference the foregoing paragraphs 1- 90 as if fully set forth herein at length.

133.     Alternatively, should the Licensing Agreement be found to be unenforceable, it nonetheless constitutes a promise by PRS, and through PRS, VER, to, *inter alia*, develop software to enable CostCommand to identify, propose, and sell Government contractors' benefits programs compliance.

134.     Under the circumstances alleged herein, the foregoing promises reasonably

-39-

induced CostCommand to rely on them as demonstrated by, *inter alia*, its monthly remission of a portion of American Guard Services' trust revenue to PRS, and through PRS, VER, which were retained by PRS and VER.

135.    CostCommand relied on the promises of PRS and, through PRS, VER, to its detriment as it, *inter alia*, spent considerable time, effort and resources soliciting business prospects, hiring experienced and highly-qualified executives, and pursuing joint ventures and alliances with major brokerages and United Healthcare based on the expected availability of the CCR software product by the late Summer of 2013.

136.    Under the circumstances alleged herein, it would be inequitable and unjust not to enforce the promise of PRS, and through PRS, VER.

137.    As a direct and proximate result of the failure of PRS, and through PRS, VER, to abide by their promise, CostCommand has been damaged in an amount in excess of $75,000 to be proven at trial.

## COUNT X
### (Promissory Estoppel – Against PRS and VER)

138.    Plaintiff incorporates by reference the foregoing paragraphs 1- 90 as if fully set forth herein at length.

139.    Alternatively, should the Promissory Note and loan commitment be found to be unenforceable, there nonetheless was a promise by PRS, and through PRS, VER, to loan CostCommand $250,000.

140.    Under the circumstances alleged herein, the foregoing promise reasonably induced CostCommand to rely on it as demonstrated by, *inter alia*, its hiring of experienced personnel

and the sums expended on various marketing initiatives, including the planned alliance with
United Healthcare.

141.    CostCommand relied on the promises of PRS and, through PRS, VER, to its
detriment as it, *inter alia*, was unable to pay for and retain its personnel, nor fund the marketing
and other initiatives with major insurance brokerages and health insurance companies.

142.    Under the circumstances alleged herein, it would be inequitable and unjust not to
enforce the promise of PRS, and through PRS, VER.

143.    As a direct and proximate result of the failure of PRS, and through PRS, VER, to
abide by their promise, CostCommand has been damaged in an amount in excess of $75,000 to
be proven at trial.

## COUNT XI
### (Breach of the Implied Covenant of Good Faith and Fair Dealing – Against PRS and VER)

144.    Plaintiff incorporates by reference the foregoing paragraphs 1- 90 as if fully set
forth herein at length.

145.    CostCommand and PRS, and through PRS, VER, were parties to the Licensing
Agreement.

146.    The Licensing Agreement contained an implied covenant of good faith and fair
dealing, pursuant to which neither party would engage in any act or conduct which deprived the
other party of the benefits of the Licensing Agreement.

147.    PRS, and through PRS, VER, deprived CostCommand of the benefits of the
Licensing Agreement by, *inter alia*, failing to develop CCR or any other software to enable
CostCommand to identify, propose and sell Government contractors' benefit program

compliance, providing such software to WH Administrators, and/or misappropriating

CostCommand's proprietary trade secrets relating to, *inter alia*, the funding of a compliance

program through trust revenue, and thereby violated the implied covenant.

148.    The wrongful acts of PRS, and through PRS, VER, alleged herein, including its

violation of the implied covenant contained in the Licensing Agreement, were, at all relevant

times, undertaken in bad faith.

149.    As a direct and proximate result of the violation by PRS, and through PRS, VER,

of the implied covenant embodied in the Licensing Agreement, CostCommand has been

damaged in an amount in excess of $75,000 to be proven at trial.

**COUNT XII**
**(Negligent Misrepresentation – Against PRS and VER)**

150.    Plaintiff incorporates by reference the foregoing paragraphs 1- 90 as if fully set

forth herein at length.

151.    The representations of PRS, and through PRS, VER, regarding, *inter alia*, its

ability to construct and implement CRR or any other software to enable CostCommand to

identify, propose and sell Government contractors' benefits programs compliance were material.

152.    Such representations were untrue, were made without a reasonable basis or

ground for believing them to be true, and for the purpose of inducing reliance by CostCommand.

153.    CostCommand, unaware that the representations regarding, *inter alia*, its ability to

construct and implement CCR or any other software to enable CostCommand to identify,

propose and sell Government contractors' benefits programs compliance were false, justifiably

relied on these representations.

154.     As a direct and proximate result of the foregoing, CostCommand has been

damaged in an amount in excess of $75,000 to be proven at trial.

**COUNT XIII**
**(Violation of the Uniform Trade Secrets Act,**
**D.C. Code §§ 36-401, *et seq.* – Against PRS and VER)**

155.     Plaintiff incorporates by reference the foregoing paragraphs 1- 90 as if fully set

forth herein at length.

156.     Pursuant to the Licensing Agreement, CostCommand provided PRS, and through

PRS, VER, with valuable information that was confidential and proprietary to CostCommand,

including, *inter alia*, the manner in which fringe benefit obligations could be made through

ERISA qualified expenses and the collection and use of real-time data for pre-payment wage

compliance, and PRS, and through PRS, VER, agreed to maintain and keep such information in

confidence.

157.     Such confidential and proprietary information was not generally known to others

in the industry, and was not readily ascertainable, by proper means, to competitors and potential

competitors of CostCommand, and provided CostCommand with a significant economic

advantage.

158.     At all times relevant hereto, CostCommand undertook reasonable efforts to

preserve the secrecy and confidentiality of the proprietary information, as evidenced by, *inter

alia*, the January, 2013 non-disclosure agreement with PRS, and through PRS, VER.

159.     The information imparted to PRS, and through PRS, VER, constitutes "trade

secrets" of CostCommand, including under the definition set forth in the District of Columbia

Uniform Trade Secrets Act.

160.    PRS, and through PRS, VER, misappropriated the trade secrets of CostCommand by wrongfully disclosing, *inter alia*, the funding of a compliance program through trust revenue and the use of real-time data for pre-payment wage compliance to, upon information and belief, WH Administrators.

161.    As a direct and proximate result of the willful misappropriation of CostCommand's trade secrets, PRS, and through PRS, VER, has been unjustly enriched and CostCommand has sustained damages and actual loss in an amount in excess of $75,000 to be proven at trial.

162.    The acts complained of herein of PRS, and through PRS, VER, were done intentionally and maliciously, and entitle CostCommand to punitive damages and its reasonable attorney's fees in an amount to be established at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, CostCommand, LLC, respectfully prays that this Court enter judgment in its favor and against Defendants, Brendan Turner, WH Administrators, Inc., PRS Software Solutions, Inc., and Full Throttle Films, Inc. d/b/a Video Equipment Rentals and:

A.    Award compensatory, incidental, and consequential damages sustained by Plaintiff;

B.    Award punitive damages;

C.    Award Plaintiff its reasonable attorneys' fees and costs;

D.    Award prejudgment and post-judgment interest; and

E.    Award such other and further relief as the Court may deem just and proper.

**DEMAND FOR JURY**

Plaintiff hereby demands a trial by jury as to all issues so triable.


KLINGMAN LAW, LLC


Dated: March 20, 2014          By:   /s/ Patrick A. Klingman
                                     Patrick A. Klingman (DC Bar # 435136)
                                     196 Trumbull Street  Suite 510
                                     Hartford, CT  06103-2207
                                     (860) 256-6120
                                     pak@klingmanlaw.com

                                     Christopher "Kip" Schwartz (DC Bar # 444650)
                                     SCHWARTZ & ASSOCIATES PLLC
                                     1010 Wisconsin Avenue, N.W.  Suite 540
                                     Washington, DC  20007
                                     (202) 342-0413
                                     kip.schwartz@schwartzassociates-law.com

                                     *Counsel for Plaintiff CostCommand, LLC*